Please rise. The State of Illinois Industrial Commission Division of the Appellate Court is now in session. The Honorable Justice William E. Coleridge presides. Thank you. Please be seated. Before we begin the morning session, for the record, you'll notice that there are four justices sitting on this court. Normally there are five. Our justice from the Fifth District unavoidably could not be here for this court call. But he will be a fully active and participating member in each and every case of this court call. He will have the full benefits of the record, all the briefs, and more, not more importantly, but as importantly, your oral arguments. And so they're all available for him to review. And so he'll be a fully participating voting member of this court. With that being said, will the clerk please call the first case. 116-2561, Lucio Moreno v. Shop and State Market. Counsel, you may proceed. May it please the Court, Counsel. My name is Damian Flores and I represent the plaintiff appellant in this case, Mr. Lucio Moreno. On March 13, 2011, my client was a healthy 33-year-old young man with absolutely no history of low back pain or any symptoms going down his legs. He sustained an unexpected accident when he slipped in the kitchen, he twisted his back, and he felt immediate complaints of low back pain with symptoms going down his legs for the first time in his life. Causal connection is agreed by the parties up through July 27, 2011. That's a key date. On this date, my client elected to proceed with surgery, and it's the employer's position that in undergoing surgery, which they find to be unnecessary, causal connection was set by seven. We're here today dealing with a question of facts. Obviously, we're dealing with the manifest weight of evidence, standard of review. I understand this is a higher level, but I will submit to you that this high standard was met for a couple of reasons. Number one being is there's undisputable evidence, a smoking gun, if you will, that has been ignored by the employer's three experts and the commission alike. Next, despite a lack of evidence, the smoking gun is a herniated disc. A herniated disc that was identified and actually removed by Dr. Harrison during surgery. The big dispute going ahead with the first surgery was whether or not there was a disc herniation. Was there a herniation noted in the MRI report? When I ask you a question, if you know the answer, give me the answer. If you don't know the answer, tell me you don't know, but don't tell me one thing and leave it for another. Judge, Dr. Harrison reviewed the MRI scan and he identified a disc herniation. I asked you whether the radiologist's report noted a disc herniation. I apologize, I thought you asked that. And Dr. Bernstein said there was no disc herniation. Correct. That is one of the disputes in the case. However, I will submit to you that MRIs can be measured and there is a disagreement amongst the doctors as to whether or not there was a herniation. Isn't it true that Drs. Levin and Bernstein opined to the contrary of Hamill and Harrison and the commission relied on Bernstein? In the utilization review by Dr. Bales, the position is that the claimant's surgeries were not medically necessary to support the causation and award the additional medical. So when you have a conflict of the experts, what are we to do about it? What we need to do here is look at what the experts relied upon, the basis for their opinions. The basis for the opinion of all these experts is their review of the MRI scan. Dr. Harrison is the only expert who physically examined the disc. He physically saw the disc. He removed a disc herniation which he identified. Dr. Bernstein testified on cross-examination that he was not in a position to disagree with Dr. Harrison. He physically said if Dr. Harrison saw it, then it was there. And then he further goes on to say he would agree that there was a disc herniation and there were ridiculous symptoms and he would agree that the surgery was a reasonable mistake. That's the reason that we're here. The basis of the opinions of each of these experts. I mean, in terms of argument, we've got the time today, but I mean, getting right to the matter here, what you're saying is Bernstein can't be used for what the commission used Bernstein's opinion for, is that right? Correct. And that's the essence of your argument here. The essence of the entire argument that the parties agreed that the crux issue is whether or not there was a herniation. Didn't Bernstein look in the MRI? He relied on the MRI scan, correct. Correct. And he said that it was essentially normal to go on with a herniation. At least that was his opinion, correct? Correct. So why couldn't the commission rely on it? Because Dr. Bernstein didn't physically examine the disc and Dr. Bernstein conceded on cross-examination that he wasn't in a position to disagree with Dr. Harrison as to whether or not there was a herniated disc because he didn't see any film through the surgery and he wasn't physically there to examine the disc through the surgery. Dr. Harrison identified and removed a disc herniation during surgery. That's how this moved. So what is this holding you're asking us? And I'm not trying to put you on the hot seat, but you can't, in essence, it's going to come down to a fact that the commission generally weighs the efficacy, the credibility, and the weight to be given to the testimony. So while you can opine that Harrison and other doctors might have arguably been in a superior position, you still have the contrary evidence. So do we say, do we assert ourselves and say the quality of this evidence is superior to the quality of the other evidence? Is that what we normally do? A similar case is the Edgecumbe case. In Edgecumbe, a similar situation where there's a dispute as to what the findings were. The injury awareness surgeon went in there and he identified a disc bulge. He identified a disc bulge, performed surgery, and the court held that he was in a better position because he physically examined the disc. These are analogous cases, but one big difference. In Edgecumbe, they identified a disc bulge. In this particular case, they identified a disc herniation and actually removed the disc herniation. That's the key difference here. It's an analogous case, but this fact goes a step further. It's not just a bulge. It's a disc herniation that was removed, and it's undisputable. And Dr. Bernstein acknowledges that he's not in a position to dispute what the surgical findings were. Did Dr. Levine say that he reviewed an MRI from April 21, I believe? He reviewed an MRI and found that it demonstrated a transitional vertebral vertebrae at S1, S2, and a new disc bulge at S5, S1 with no herniation or vertebrate impingement. That's what Dr. Levine said, didn't he? Correct. And he said we shouldn't believe him either because he didn't operate on him. My position is that the experts which the employee relies upon only reviewed the MRI scan. We understand that. We understand that. You also have a utilization review here by Dr. Bayless that says that the surgery that was performed on your client was totally unnecessary because what he was complaining about had nothing to do with the L45 disc. Well, the utilization review, the whole utilization review process is inherently flawed because, once again, Dr. Bayless says we can't believe Levine, we can't believe Bernstein. The utilization review process is flawed. All of these things, your arguments about who saw what and who operated was known to the commission, wasn't it? They knew all this, and they chose to believe Levine and Bernstein. That's to suppose Erickson. But you're saying Bernstein, on cross-examination, walked back on that direct examination opinion. Correct. On cross-examination, Dr. Bernstein acknowledged, he essentially said, if Dr. Erickson saw a disc herniation, then it was said. Okay. Now, if Levine did say that, okay, but you're saying he only had access to the MRIs, correct? Correct. And the commission chooses to go with Levine. Is that permissible or impermissible? I'm sorry? Is that permissible or impermissible? Okay. Or is it enough support? I don't believe it's enough support. It's against the medical school of developments because you've got two doctors that are acknowledging that a disc herniation is there. And the crux issue is whether or not there was a disc herniation. And doctors will then solely rely upon the MRI scan. Generally, an MRI scan isn't the best standard to prove to see whether or not there's a herniation there. However, if you go one step further, the person who actually examines a disc, that's going to be the one situation where you're going to have, well, the MRI scan is not the best tool. And what do we have linking up to disc herniation other than that? Obviously, apparently, the troopers and the pruning surgeon saw it and took care of it, right? Where's the connectivity between that and the medical school of developments? For starters, the whole history of the young man, no history of any complaints of back pain or motion or pain. Counsel acknowledges that causal connection exists from the day of accident through the day of surgery. And counsel specifically says that the crux issue is whether or not surgery is reasonable and necessary. There's no dispute that he had no prior history. So he had immediate symptoms of low back pain and symptoms going down his artery. And those symptoms that Dr. Mervin recommended in EMG. So the second issue that I want to get to is the issue of the MMI date. The commission found that the MMI date was April 28, 2011. However, on this date, Dr. Mervin did not find my client to be at maximum medical approval. He specifically recommended EMG. About two weeks later, he reviews the EMG, and he says, no, he doesn't agree with the EMG findings. He's a positive, by the way. Subsequent to that, Dr. Mervin doesn't find him to be at MMI. He recommends an FCE to further determine if your condition will be of benefit. My client had the FCE, and the FCE found them to be permanent sedentary restrictions. So if the commission truly adopted the opinions of Dr. Mervin, my client would be permanent sedentary restrictions. A 33-year-old young man, permanent sedentary restrictions. Fortunately for him, he would not have- So what does that have to do with MMI? Well, it has to do with MMI. MMI is the point where no further treatment is going to better his medical condition. If it's permanent sedentary- Restrictions. Restricted. Permanent. Permanent sedentary restrictions. If it's permanent, can it be fixed? Well, that's the issue. If he's truly at MMI, then he wouldn't be able to be fixed. However, if he undergoes a surgery, undergoes a treatment- He didn't undergo surgery that Bayless says wasn't even medically necessary. Yet he improved. Bernstein says that the lower extremity symptoms, which he complained of, were not the pattern of distribution from the nerve at L4-5. So he's complaining about symptoms that have nothing to do with L4-5, which is where you said was herniated, or where Erickson said was herniated. In addition to that, looking at the post-op with MMI, Bernstein said it didn't even disclose any evidence of a disc herniation It opened the door to compression, and he found no evidence of scar tissue, which would suggest that the claimant had a disc herniation. Okay. Two things. The commission did find that Dr. Erickson performed a surgery. And number two, Dr. Bernstein testified that on cross-examination, that generally 80% to 90% of the times he will see scar tissue. This is one of the 20% to 10% of the times where there's no scar tissue. So the commission specifically found that they did deny that the surgery took place. And back to the issue of MMI. If my client was truly at MMI, he would have permanent sanitary restrictions. He never went to surgeries. And now he testified that he's got permanent medium-level restrictions, which is significantly better than permanent sanitary restrictions. And he testified that he's generally pain-free. So my question is a question based on something you've been saying, because it's frequently misunderstood. If a person is at MMI, as a matter of law, are they fully recovered? Or as a matter of fact, is there a meaning in the words of this conversation? Does that mean they're fully recovered? It means that there's no further medical treatment which will further his condition. Which ultimately means he's fully recovered, doesn't he? Yes. Then that's what we want to do. I don't see why it does not mean he's fully recovered. It means there's no more medical treatment that will assist him in curing whatever injury he suffered for the reason of the industrial accident. If a guy has an amputation, he can be at MMI, but his leg doesn't grow back. So sometimes it's permanent. Other times you're at MMI and you can still work. And sometimes you're at MMI and you come off of MMI because there's something that happens in the future. But in this particular case, my client was found to be at MMI with permanent sedentary restrictions. He's glad that he underwent two surgeries, and his condition significantly improved to where he was at. That's the cross-section there. He had significant improvement of his condition, a condition that a respondent agrees on, the employer agrees, was causing him to not get up to the date prior to surgery. It was Levin's opinion that subsequent to April 28, 2011, there was no justification for additional chiropractic or physical therapy treatment for the plaintiff. Dr. Levin didn't testify. He didn't testify. Dr. Levin's opinion was that further chiro treatment and physical therapy wasn't necessary. So what he recommended, he did recommend treatment after April 28, 2011, and he wasn't sure whether additional treatment was needed because he wanted an S&E to determine whether work conditioning would help. And for those reasons, it's our position that, number one, there was a discrimination there, and that's undisputable. Number two, the conditions selecting April 28, 2011 was an arbitrary date because if they truly adopted the opinions of Dr. Levin, he further recommended treatment. And even the employer agrees that causal connection extended beyond April 28. And then finally, it's undisputable that after undergoing the surgeries, my client had significant improvement. So he was truly not at MMI because his condition improved significantly to the point where he testified that he was generally pain-free compared to how he was at prior surgery. Thank you. Thank you, Counselor. Can I ask a question before you leave the podium? Yes, sir. Who drafted the decision for the commission? Who drafted it? The commission drafted it itself or somebody else drafted it? Because it happens to be the worst decision I've ever read, and I've been on this Court since 2000. It says absolutely nothing. I've typed. We have Commissioner Gore, Basurdo, or Mathis, but I couldn't say who specifically drafted it. Okay. Next question. Counselor, you may respond. Thank you. If it pleases the Court, Counsel, Michelle Athlet on behalf of the employer Shop and Save Market. At the crux of the issue in this case is whether or not the commission's decision was against the manifesto of the evidence. And as the Court has noted, you tend to give deference to the commission in terms of their factual findings and their credibility findings. And this really came down to a question of whether or not the commission found the organization reviewed by Dr. Berges, the IRB opinions of Dr. Levin, and the opinion of Dr. Bernstein more credible than that of Dr. Engel and Dr. Erickson. When you make up this counsel ostensibly recognizes there's a conflict in the evidence. Normally, it's the credibility of those fact-finders and the commission, but his argument seems to be a little more subtle. He's saying that the expert's opinion is only as good as the underlying fact that evidence is relied upon. He's saying that the surgeon was in a much more superior position, clearly, to examine the herniation in situs. So how do you respond to that argument? My response to that would be that the General Assembly adopted the utilization review as the measure by which the commission is to determine medical necessity. And that is the primary vehicle by which an employer can challenge medical necessity. Does the case law say that it's the primary consideration? Well, I didn't find any case that was going to that issue because this is a somewhat new utilization review. But if you look at the statute itself, it is saying that while there's one piece of evidence to be considered, employers are to challenge medical necessity by utilizing utilization review. And under utilization review, the utilization review provider has to take a snapshot of the evidence or the medical information available to the treating physician at the time the recommendation for treatment is made. We don't look at what came afterwards any longer. So you can't really say the surgeon is in a better position because he went in and actually looked at the operative findings. You have to look at the surgeon's opinion at the time he was making the recommendation, what he was relying on, and then use utilization review, which is what these doctors have done, to determine if there's medical necessity. Wait a minute. You've got to help me out there. Are you telling me that the commission is to look to what information was available to the treating physician at the time he made the diagnosis without regard to what he found in the operative domain? Well, that's what utilization review does. That doesn't make any sense. If you look at the— Ma'am, that doesn't make any sense. Utilization review, yes, it looks at everything that the doctors look at, but the question becomes, did the guy have a herniation, yes or no? If the answer is yes, he had a herniation, no one cares what the utilization review says. Well, what you have to look at is the evidence that was available at the time the treatment recommendation was made. So let me understand this. If there was insufficient information at the time the recommendation for surgery was made, based on the utilization review, they can't recover the medical for the surgery even if it was necessary. Is that a yes? Is that true? I'm not sure I understand the question. I'll try it again. Okay. If the information available to the doctor at the time he made the recommendation for surgery was insufficient according to the utilization review report, are you telling me that if the man had the surgery and he actually needed the surgery, he can recover? Is that your argument? No, I don't think that's the argument. Well, then why? Then we're not bound necessarily by the utilization review from the point of view of the treated physician when he makes his diagnosis. We've got to be bound by what actually occurred in the treatment of the individual. Well, but you also have to look at what the UR is designed to do. It's designed to ensure that the patient is receiving the appropriate care. And in this instance, it comes back to that initial MRI study where you've got three doctors. It isn't utilization review. I know what you're saying. It isn't utilization review if it is an employer piece of legislation. It's more as a protection against penalties in the act, that if you deny that surgery, that you can use that as a defense that that denial was reasonable and should not be penalized. If there was subsequent evidence to suggest that the surgery was reasonable, necessary after the surgery was completed. I don't think that's the sole purpose for utilization review. Oh, I don't think the legislation ever has a sole purpose. I would say that that would be an advantage for a respondent, an employer. Correct. I would say that to use that as a buffer, as a defense for denial. But I think Justice Hoffman's question is, if the utilization review suggests that it's not necessary surgery and not reasonable, but somehow it proceeds, is that a bar then for the employer respondent to be responsible for the cost of that surgery? Is that what you're saying? I don't know. Maybe Justice Hoffman understands where I'm coming from. Yeah, I don't think that's really what even I'm saying here. What I'm saying in this case is that I think even if you look at that first surgery, and the question is on that first surgery, he doesn't get better with the first surgery. So, therefore, you've got a surgery that Dr. Levin, actually Dr. Levin doesn't address the surgery, but you've got what Dr. Bernstein says was not medically necessary, utilization review says was not medically necessary, that has no benefit to him after it has taken place. Which would be supportive of the commission's decision. Which would be supportive of the commission's decision. So the respondent employer is not responsible for that cost. Correct. He doesn't actually improve until after the second surgery. Okay. But if you look at the MRI study from March of 2011, that's the crux of it, is that the radiologist finds no herniation, Dr. Levin finds no herniation, and Dr. Bernstein finds no herniation. And those are the three opinions that the commission relies on in finding there was no evidence of a herniation and, therefore, no medically necessary surgery. I'm going to argue back to the utilization review areas today because I'm not listening to the discussion back and forth. To carry it out to this logical extent, it would seem like you're saying that it doesn't matter what the surgery shows. You've got 15 herniations, but the respondent still wins because the opinion before the surgery was that it probably wasn't a disc herniation. So you've got to be a little bit careful with that. Actually, the difficulty here is the opinion in the utilization review didn't come before the surgery. The surgery was done on July 27, 2011. The utilization review report is dated February 14, 2012, and he based it in part upon the fact that the clinic had a normal EMG and the clinic had a 2-millimeter disc bulge and no stenosis as reflected in the MRI of March. The clinic's motor strength was 5.5. The symptomatic reflexes and animal sensory change. He found no herniation. Correct. Which is what Bernstein said and is also what the line said. Correct. He had no herniation. But your opponent says that because Erickson did his surgery, his opinion should be carried today. Well, there's no case that says you have to go with the treating physician. If you look at the Prairie Farms case, you don't necessarily need to do so. What do we do with Bernstein walking back in cross-examination as represented by opposing counsel? I don't think Dr. Bernstein walked back his opinion on cross-examination. And on redirect examination, the questions to Dr. Bernstein went to whether or not there was any evidence the surgery had been performed as represented by Dr. Erickson. And I believe Justice Hoffman touched on this, that Dr. Bernstein found no evidence on the post-operative MRI studies on that original surgery. He found no scar tissue. He found no evidence that there had been a violation of integrity to the spinal canal. He seemed to question whether or not the surgery actually occurred in the manner that Dr. Erickson alleged that it did. And I think that's significant, because you're looking at judging credibility of physicians, and the commission is looking at the totality of Dr. Bernstein's opinions and all of the opinions that he gave in response to the questions and coming to the conclusion that he was more credible than Dr. Erickson and Dr. Bernstein had not walked back his opinion. We have to be careful about something. First of all, I'm going back to my comment that this is one of the worst written decisions the commission has ever put out. But the only thing that I found on this record that was worse was the arbitrator's decision. Because the arbitrator's decision is an Ipsy Dixit. He doesn't give a single reason for his findings. He turns them on and says, you get X number of dollars for this, you get X number of dollars for that. Not a single reason. The commission's decision did not find Dr. Bernstein more credible than Dr. Erickson. The commission never mentioned either of them. The only thing the commission mentioned that had anything to do with it, this being his herniation, was on April 28, 2011, Lombard MRI revealed relatively unmarked results outside of a minimal disc bulge at L5-S1 with no herniation or impeachment. That's all they said. And said that Levine opined that he couldn't substantiate any reason for any additional chiropractic or physical therapy. They don't mention Bernstein. They don't mention Erickson. They mention nothing. Who drafted this? Somebody at the commission. It is not either a program counselor or myself. Who drafted the arbitrator's decision? The arbitrator, more likely, because it was not the proposal a person counselor or myself submitted. Does that mean you have to distance yourself from the arbitrator? I'm not suggesting you should suggest the arbitrator's school if this is what they're doing. A person counselor and I have framing issues as they're framed before the instance, the guy going over there, before the arbitrator. The quality of the two decisions that have come through is unfortunate at this point, and we are both now dealing with the issues as we frame them since the get-go. But I think, getting back to that, when the commission reached the findings that they reached, it's inherent in that decision that they were finding Dr. Levine, Dr. Bernstein, and utilization would be more credible than Dr. Erickson or Dr. Engel. Then you could alternatively argue that there's sufficient evidence in the record to support the commission's decision. Correct. That's your record. That's the argument at the end of the day. If there's no other questions, I would rest our argument there. Thank you very much. Thank you. Counsel. Just briefly, I understand that I have a hydro to jump here. Generally, we're stuck with the commission's findings of fact. But there are examples, and a proof of the example is Edgecombe, where this Court has found that the commission's findings of fact were against a manifest way of evidence. This case is just in line with that. I'm going to step further because there was a natural variation. Number two, I want to point out, counsel does not deny that causal connection to Shady State beyond April 28, 2011. That is sufficient to require a remand because the commission allegedly relied upon Dr. Levine, but he recommended additional treatment. Hold on a second. This man has 4% loss of use as a man as a whole. That wasn't cured after April the 28th. He has 4% loss of use as a man as a whole. And there was a causal connection between his work injury and that condition. It exists after April the 28th. But the problem is that it's a permanent condition. And so there's no more medical. There's nothing. I mean, just because they concede causation, it doesn't mean that his entitlement to TTD and his entitlement to medical didn't end on April the 28th. He's got a condition that existed after April the 28th, doesn't he? 4% loss of use as a man as a whole. Well, that's what the commission would find. If they actually adopted the opinions of Dr. Levine, 4% man as a whole, it is not in line with somebody who, per the opinions of Dr. Levine, would have permanent sedentary restrictions. Why not? Nature and extent is for the commission to determine. Well, if you look at the case, I don't have specific examples here, but that's more in line with somebody who sustained a lumbar strain and returned to work full duty. This is not in line with a 33-year-old who has permanent sedentary restrictions for the rest of his life. And that's where my client would be at if not for having undergone the surgeries. As far as the treatment, counsel denies that my client improved with the first surgery, but there's no disagreement amongst the party as to whether he improved with the second surgery. Except that Bernstein said the second surgery was wholly unnecessary because it did nothing but repair the first surgery, which wasn't medically necessary. Even assuming, I would agree that the first surgery wasn't successful. Whether or not the surgery was successful does not take away the reasonable necessity of the surgery. Well, no, Bernstein said it wasn't necessary. Correct. So did Bayless. Both of them said absolutely unnecessary. Which brings us back to the first argument as to whether or not there was a herniation there. And then the one thing in regards to counsel's argument regarding the utilization review, the utilization review law did not go into effect until September 1, 2011. The surgery took place on July 27, 2011, which was prior to the surgery, or which was prior to the act taking effect. Aside from that, if there's no further questions, I have nothing further to say. Thank you. Thank you, counsel, both for your arguments on this matter. It will be taken under advisement that this position will issue.